Approved: _____
ANDREW C. ADAMS / NOAH L. FALK
Assistant U.S. Attorneys

Before:   HONORABLE JAMES L. COTT
          United States Magistrate Judge
          Southern District of New York

- - - - - - - - - - - - - - - - - - - x
                                      :   **SEALED COMPLAINT**
                                      :   Violations of 18 U.S.C.
UNITED STATES OF AMERICA              :   § 1956 & 21 U.S.C. § 846
                                      :
            - v. -                    :
                                      :
ALEJANDRO JAVIER RODRIGUEZ-JIMENEZ,   :   COUNTY OF OFFENSE:
    a/k/a, "alejandro@dmxtec.com,"        NEW YORK
    a/k/a, "alejandro@vegasls.com,"  :
JESUS RODRIGUEZ-JIMENEZ,
ELOY CARDENAS-MORENO,                 :   **16 MAG  4153**
SERGIO URBINA, and
LEOBARDO TAMEZ,                       :

            Defendants                :
- - - - - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

   DAVID BEHAR, being duly sworn, deposes and says that he is Special Agent with the U.S. Drug Enforcement Administration ("DEA"), and charges as follows:

**COUNT ONE**
(Conspiracy to Commit Money Laundering)

   1.   From at least in or about August 2013 through at least in or about June 2016, in the Southern District of New York and elsewhere, ALEJANDRO JAVIER RODRIGUEZ-JIMENEZ, a/k/a "alejandro@dmxtec.com," a/k/a "alejandro@vegasls.com," JESUS RODRIGUEZ-JIMENEZ, and ELOY CARDENAS-MORENO, SERGIO URBINA, and LEOBARDO TAMEZ, the defendants, and others known and unknown, knowingly did combine, conspire, confederate and agree together and with each other to violate the money laundering laws of the United States.

   2.   It was further a part and an object of the conspiracy that ALEJANDRO JAVIER RODRIGUEZ-JIMENEZ, a/k/a

"alejandro@dmxtec.com," a/k/a "alejandro@vegasls.com," JESUS RODRIGUEZ-JIMENEZ, and ELOY CARDENAS-MORENO, SERGIO URBINA, and LEOBARDO TAMEZ, the defendants, and others known and unknown, knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, would and did conduct and attempt to conduct such a financial transaction which in fact involved the proceeds of specified unlawful activity as defined in 18 U.S.C. § 1956(c)(7), to wit, the proceeds of the sale and distribution of a controlled substance, in violation of 21 U.S.C. § 841(a)(1), knowing that the transaction was designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

       3.     It was further a part and an object of the conspiracy that ALEJANDRO JAVIER RODRIGUEZ-JIMENEZ, a/k/a "alejandro@dmxtec.com," a/k/a "alejandro@vegasls.com," JESUS RODRIGUEZ-JIMENEZ, and ELOY CARDENAS-MORENO, SERGIO URBINA, and LEOBARDO TAMEZ, the defendants, and others known and unknown, would and did transport, transmit, and transfer, and attempt to transport, transmit, and transfer, a monetary instrument and funds from a place in the United States to and through a place outside the United States, and to a place in the United States from and through a place outside the United States, with the intent to promote the carrying on of specified unlawful activity, to wit, the distribution of a controlled substance, in violation of 21 U.S.C. § 841(a)(1), in violation of Title 18, United States Code, Section 1956(a)(2).

       4.     It was a part and an object of the conspiracy that ALEJANDRO JAVIER RODRIGUEZ-JIMENEZ, a/k/a "alejandro@dmxtec.com," a/k/a "alejandro@vegasls.com," JESUS RODRIGUEZ-JIMENEZ, and ELOY CARDENAS-MORENO, SERGIO URBINA, and LEOBARDO TAMEZ, the defendants, and others known and unknown, in an offense involving and affecting interstate and foreign commerce, knowingly would and did engage and attempt to engage in monetary transactions in criminally derived property of a value greater than $10,000 that was derived from specified unlawful activity, to wit, the proceeds of the sale and distribution of a controlled substance, in violation of Title 18, United States Code, Section 1957(a).

       (Title 18, United States Code, Section 1956(h).)

## COUNT TWO
(Narcotics Conspiracy)

5.      From at least in or about August 2013 through at least in or about June 2016, in the Southern District of New York and elsewhere, ALEJANDRO JAVIER RODRIGUEZ-JIMENEZ, a/k/a "alejandro@dmxtec.com," a/k/a "alejandro@vegasls.com," JESUS RODRIGUEZ-JIMENEZ, and ELOY CARDENAS-MORENO, the defendants, and others known and unknown, knowingly combined, conspired, confederated, and agreed together and with each other to violate the narcotics laws of the United States.

6.      It was a part and an object of the conspiracy that ALEJANDRO JAVIER RODRIGUEZ-JIMENEZ, a/k/a "alejandro@dmxtec.com," a/k/a "alejandro@vegasls.com," JESUS RODRIGUEZ-JIMENEZ, and ELOY CARDENAS-MORENO, the defendants, and others known and unknown, would and did distribute and possess with intent to distribute a controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

7.      The controlled substance involved in the offense was (1) 5 kilograms and more of mixtures and substances containing a detectable amount of cocaine, its salts, optical and geometric isomers, and salts of isomers; (2) 1 kilogram and more of mixtures and substances containing a detectable amount of heroin; and (3) 50 grams and more of methamphetamine, its salts, isomers, and salts of its isomers, and 500 grams and more of a mixture and substance containing a detectable amount of methamphetamine, its salts, isomers, and salts of its isomers, in violation of Title 21 United States Code, Section 841(a)(1) and 841(b)(1)(A).

(Title 21, United States Code, Section 846.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

8.      I have been a DEA Special Agent for approximately eighteen years. During that time, I have participated in numerous investigations of unlawful drug distribution. During the course of those investigations, I have conducted or participated in surveillance, drug transactions with undercover officers ("UCs") and confidential informants ("CIs"), the introduction of UCs and CIs, the execution of search warrants, debriefings of witnesses, and reviews of taped conversations and drug records. Through my training, education, and experience, I have become familiar with the manner in which illegal drugs are

imported and distributed; the way in which illegal drugs are prepared, packaged, and sold on the street; some of the methods of payment for such drugs; and some of the methods that are used to disguise the source and nature of the profits made by drug dealers.

9. I make this Affidavit in part on personal knowledge based on my participation in the investigation and conversations with other DEA Special Agents and Task Force Officers ("TFOs"), and other law enforcement officers; conversations with UCs and CIs; reviews of reports and other documents prepared by agents and others; and physical surveillance.

10.    Throughout this Affidavit, where I assert that a statement was made, I was not the individual to whom the statement was made unless I specifically so state. Rather, information about the statement was provided by the specified law-enforcement officer or CW to whom I have spoken or whose reports I have read and reviewed. Such statements are among many statements made by others and they are set forth in substance and in part, unless otherwise indicated. Similarly, the information in this Affidavit resulting from surveillance, except where otherwise specifically indicated, does not set forth my personal observations, but rather was provided to me by other law-enforcement officers who observed the events described, and/or to whom I have spoken or whose reports I have read.

11.    Furthermore, the facts and circumstances of this investigation have been summarized for the specific purposes of this Application. I have not attempted to set forth the complete factual history of this investigation or all of its details. In making this Application, I rely only on the facts stated herein.

### Background to the Investigation

12.    Since in or around July 2013, the DEA has been investigating an international drug trafficking and money laundering organization (the "Organization") involved in trafficking hundreds of kilograms of cocaine and heroin, among other narcotics, and laundering narcotics proceeds through a variety of methods including through one or more seemingly "legitimate" corporations under their control. As detailed further below, the Organization has ties to Panama, Mexico, Italy, Spain, and the United States, among other locations, and

4

its members are believed to include each of the defendants named herein.

13. In particular, and based on this investigation, which has involved multiple judicially authorized wiretaps of phones being used by members of the Organization; debriefings of multiple confidential sources and informants; consensual recordings; and interceptions of narcotics and narcotics proceeds; as well as agent surveillance, I am aware that Roberto Ponce-Rocha, a/k/a "Paco Ulysses," a/k/a "Licenciado," a/k/a "Lic Ponce," is a large-scale international narcotics trafficker based in Tijuana, Mexico who imports narcotics from sources of supply in South and Central America to purchasers across the world, including members of the Organization based in the United States.[1]

14. Based on a review of calls, text messages, and e-mails intercepted over a series of cellular telephones belonging to Ponce-Rocha (the "Ponce-Rocha Cellphones") pursuant to judicially authorized wiretaps, I am aware that Ponce-Rocha has numerous individuals working at his direction in furtherance of his drug trafficking activities. In particular, I am aware that Ponce-Rocha used various methods including commercial shipments, drivers and couriers to move narcotics around the world and, in particular, to import narcotics into the United States. Based on a review of intercepted calls and communications occurring over the Ponce-Rocha Cellphones, I and other agents have been able to identify and intercept numerous narcotics shipments destined for importation into the United States. For example, based on these intercepted calls and communications, I and other agents have intercepted the following intended drug shipments, all of which the Organization attempted to import via cars crossing the Mexican-United States border at various points of entry:

    a. On or about February 14, 2014, law enforcement agents were able to stop a driver believed to be working for Ponce-Rocha ("Driver-1") as Driver-1 attempted to enter the United States by car and via a point of entry in

---

[1] Ponce-Rocha is among four individuals charged in superseding Indictment *United States* v. *Ponce-Rocha*, 16 Cr. 30 (JMF), unsealed in this District on or about May 25, 2016. Prior to that unsealing, Ponce-Rocha was arrested by Colombian authorities on or about March 20, 2016; he was detained at that time and is currently awaiting the outcome of an extradition request.

Southern California. Consistent with intercepted communications over the Ponce-Rocha Cellphones, agents were able to recover approximately 7.7 kilograms of heroin from the vehicle.

        b.      On or about March 5, 2014, law enforcement agents were able to stop a driver believed to be working for Ponce-Rocha ("Driver-2") as Driver-2 attempted to enter the United States by car and via a point of entry in Southern California. Consistent with conversations intercepted over the Ponce-Rocha Cellphones, agents were able to recover approximately 9.8 kilograms of cocaine from the vehicle.

        c.      On or about May 6, 2014, law enforcement agents were able to stop a driver believed to be working for Ponce-Rocha ("Driver-3") as Driver-3 attempted to enter the United States by car and via a point of entry in Southern California. Consistent with conversations intercepted over the PONCE Cellphones, agents were able to recover approximately 8.55 kilograms of methamphetamine from the vehicle.

        d.      On or about October 16, 2014, law enforcement agents were able to stop a driver believed to be working for Ponce-Rocha ("Driver-4") as Driver-4 attempted to enter the United States by car and via a point of entry in Southern California. Consistent with conversations intercepted over the PONCE Cellphones, agents were able to recover approximately 11.88 kilograms of cocaine from the vehicle.

        e.      On or about December 9, 2014, law enforcement agents were able to stop a driver believed to be working for Ponce-Rocha ("Driver-5") as Driver-5 attempted to enter the United States by car and via a point of entry in Southern California. Consistent with conversations intercepted over the Ponce-Rocha Cellphones, agents were able to recover approximately 10.3 kilograms of cocaine from the vehicle.

### The Defendants' Roles Within the Organization

A.    The Rodriguez-Jimenez Brothers

     15.    As set forth further below, based on my debriefings of UCs and CIs with direct contact with ALEJANDRO JAVIER RODRIGUEZ-JIMENEZ, a/k/a "alejandro@dmxtec.com," a/k/a "alejandro@vegasls.com," the defendant; consensual recordings, including consensual recordings involving ALEJANDRO JAVIER RODRIGUEZ-JIMENEZ; agent surveillance; and the review of emails obtained from accounts controlled by ALEJANDRO JAVIER RODRIGUEZ-

JIMENEZ, I am aware that ALEJANDRO JAVIER RODRIGUEZ-JIMENEZ is a drug trafficker and money launderer who, among other things, facilitates the sale of narcotics from Ponce-Rocha to various customers, and who assists in laundering the proceeds of such sales. I am further aware that ALEJANDRO JAVIER RODRIGUEZ-JIMENEZ is based in Las Vegas, Nevada, as well as Mexico.

      16.    As part of the investigation, other agents and I have debriefed a paid confidential source ("CS-1"). Information provided by CS-1 has proven to be reliable and accurate and has been corroborated by information obtained through other sources, including through consensual recordings and statements made to law enforcement by other members of the Organization. From my conversations with CS-1, I have learned, among other things, that:

      a.    ALEJANDRO JAVIER RODRIGUEZ-JIMENEZ, a/k/a "alejandro@dmxtec.com," a/k/a "alejandro@vegasls.com," the defendant, participates as a member of the Organization primarily through a front company, "Vegas LED Screens" (hereinafter, the "Vegas Company"), a corporation under the control of ALEJANDRO JAVIER RODRIGUEZ-JIMENEZ. In particular, according to CS-1, ALEJANDRO JAVIER RODRIGUEZ-JIMENEZ uses the Vegas Company and its purported legitimate business activities to both mask shipments of narcotics and conceal the transfer of narcotics proceeds between members of the Organization.

      b.    On or about October 30, 2014, CS-1 and ALEJANDRO JAVIER RODRIGUEZ-JIMENEZ met at a restaurant in Las Vegas, Nevada. During that meeting, which was consensually recorded at the DEA's direction by CS-1, CS-1 and ALEJANDRO JAVIER RODRIGUEZ-JIMENEZ discussed potential money laundering transactions and, in particular, the ability of ALEJANDRO JAVIER RODRIGUEZ-JIMENEZ to launder funds through the Vegas Company. Toward that end, ALEJANDRO JAVIER RODRIGUEZ-JIMENEZ indicated to CS-1, in substance, that ALEJANDRO JAVIER RODRIGUEZ-JIMENEZ could create fake "contracts" using the Vegas Company to offer purportedly legitimate reasons for large money transfers. ALEJANDRO JAVIER RODRIGUEZ-JIMENEZ further discussed his prior laundering activities with a coconspirator not named herein ("CC-1"), and, specifically a prior incident leading to the loss of money by CC-1 as a result of a law enforcement seizure.[2]

---

[2] On or about February 12, 2014, two money couriers were stopped by law enforcement officers patrolling an Amtrak station in Chicago, Illinois. Those couriers were in possession of four rolling suitcases containing approximately $989,250 in cash.

17.     Based on my review of communications, including electronic communications, intercepted over the Ponce-Rocha Cellphones, as well as my review of emails obtained from the email account "alejandro@dmxtec.com" ("Rodriguez-Jimenez Account-1"), I have learned, among other things, that:

        a.     On or about August 7, 2013, ALEJANDRO JAVIER RODRIGUEZ-JIMENEZ, a/k/a "alejandro@dmxtec.com," a/k/a "alejandro@vegasls.com," the defendant, sent a communication to one of the Ponce-Rocha Cellphones from Rodriguez-Jimenez Account-1. According to the intercepted communication, ALEJANDRO JAVIER RODRIGUEZ-JIMENEZ is saved as a contact in that Ponce-Rocha Cellphone under his full name "Alejandro Rodriguez Jimenez" and, as reflected in the draft DEA translation of that Spanish-language e-mail, in that communication ALEJANDRO JAVIER RODRIGUEZ-JIMENEZ communicated to Ponce-Rocha that "the person from Spain . . . was here in my office and they fulfill your needs, check it out and if you want to you can give them a call for further information. It is a family and they are willing to take 3 Mexican girls, if you are interested I could send you some money over in Spain, you let me know." Based on my participation in the investigation, as well as my training and experience, I believe ALEJANDRO JAVIER RODRIGUEZ-JIMENEZ was communicating to Ponce-Rocha that a narcotics purchaser based in Spain was interested in three kilograms of narcotics. ("They are willing to take 3 Mexican girls"). ALEJANDRO JAVIER RODRIGUEZ-JIMENEZ further offered to help launder the money necessary for the transaction. ("If you are interested I could send you some money over in Spain").

        b.     On or about May 21, 2014, Ponce-Rocha sent a message to ALEJANDRO JAVIER RODRIGUEZ-JIMENEZ via the e-mail address "alejandro@vegasls.com" ("Rodriguez-Jimenez Account-2"). The DEA translation of that Spanish-language communication reads as follows: "Alex, I am interested in a 8mm screen of 2x2 but I need to see if you can [] me a Pathfinder Nissan 2010, the deluxe one . . . ." Several hours later, ALEJANDRO JAVIER

---

One of these couriers ("Courier-1") was later observed, on or about January 31, 2014, by employees of a particular bank branch located in Las Vegas ("Bank-1") in the presence of CC-1 at Bank-1, where Courier-1 and CC-1 together deposited approximately $300,000 in cash, which they brought into Bank-1 in a shoebox, and which consisted of bundles of cash wrapped in straps bearing the name of a particular casino in Las Vegas ("Casino-1").

8

RODRIGUEZ-JIMENEZ responded from Rodriguez-Jimenez Account-2, indicating, in Spanish and as translated by the DEA, that the requested "screen" was not "in stock, it has to be fabricated" adding that "I will check with pleasure and of course I would take it. I will call you tomorrow." Based on my training and experience, as well as my participation in the investigation, I believe that through these communications, Ponce-Rocha was asking ALEJANDRO JAVIER RODRIGUEZ-JIMENEZ for ALEJANDRO JAVIER RODRIGUEZ-JIMENEZ's assistance in moving narcotics disguised as a shipment of screens via a vehicle, consistent with the seized shipments described above. ALEJANDRO JAVIER RODRIGUEZ-JIMENEZ responded that he would need time to "fabricate" the paperwork and other items necessary to support the shipment and would respond in short order.

          c.     On or about September 25, 2014, a message was intercepted from one of the Ponce-Rocha Cellphones that had been sent to Rodriguez-Jimenez Account-2. The DEA translation of that message reads as follows: "The business deal is like this. The screen out from here, No taxes are paid at arrival over there because they cannot see it, even with a scanner. The arrival over there does not incur expenses. It is more or less the type of television that we tried sending between your friend and I to your friend's house; the one that arrived but without results. It is very similar but much more professional. With the difference that a screen with 250 modules can be sent from here, without it being noticed. Hopefully, you will be able to contact your friend." Based on my training and experience, as well as my participation in the investigation, I believe Ponce-Rocha was requesting ALEJANDRO JAVIER RODRIGUEZ-JIMENEZ's assistance in shipping narcotics disguised as LED televisions through the Vegas Company. In particular, I believe Ponce-Rocha was proposing a shipment of narcotics similar to a prior shipment completed the previously ("It is more or less the type of television that we tried sending between your friend and I to your friend's house"). This time, however, Ponce-Rocha was proposing a much more sophisticated shipment method which would be used to avoid detection. ("It is . . . much more professional . . . [so it] can be sent from here, without it being noticed.").

          d.     Consistent with the above, on or about October 4, 2014, a message was intercepted from a Ponce-Rocha Cellphone to Rodriguez-Jimenez Account-2. In the body of that message, there was no text but instead a video approximately 7 minutes and 12 seconds in length. The video shows the chest and body of an unidentified male whose face appears to be

intentionally cut out of the frame ("UM-1"). During the video, UM-1 appears to demonstrate the process of concealing narcotics in an otherwise standard cardboard shipping box. In particular, the video appears to depict UM-1 heat-sealing a white plastic bag - frequently known as an "anti-scan" bag because it is resistant to most forms of external detection - before placing it in a hollowed out portion of a cardboard box. UM-1 then conceals the bag by covering over the hollowed out portion of the box with corrugated cardboard and sealing it shut.

    e.  On or about October 4, 2014, using the same Ponce-Rocha Cellphone, Ponce-Rocha sent a second video to ALEJANDRO JAVIER RODRIGUEZ-JIMENEZ via Rodriguez-Jimenez Account-1. That e-mail contained a video in which a person appearing to be the same individual described above, UM-1, completes the process described above. In particular, in this video, UM-1 appears to have finished sealing the secret compartment in the cardboard box, described above, which UM-1 then fills with innocuous cargo - in this case, bowls - before closing the box for shipment.

  18.  Based on debriefings of CS-1 as well agent surveillance and a review of consensually recorded calls and conversations, I have learned, among other things, that:

    a.  Based, in part, on the October 30, 2014, conversation between ALEJANDRO JAVIER RODRIGUEZ-JIMENEZ, the defendant, and CS-1, described above, as well as similar subsequent conversations, ALEJANDRO JAVIER RODRIGUEZ-JIMENEZ and CS-1 began speaking in or about April 2015 regarding the possibility of CS-1 assisting in the laundering of narcotics proceeds on behalf of the Organization. Specifically, ALEJANDRO JAVIER RODRIGUEZ-JIMENEZ inquired as to whether CS-1 would be able to launder approximately $100,000 at a time for the Organization. CS-1, acting at the direction of law enforcement, indicated that he could do so and made arrangements to meet with ALEJANDRO JAVIER RODRIGUEZ-JIMENEZ in Atlanta, Georgia, to discuss specifics of such laundering.

    b.  On or about March 27, 2015, CS-1 met in Las Vegas, Nevada, with JESUS RODRIGUEZ-JIMENEZ, the defendant, (whom ALEJANDRO JAVIER RODRIGUEZ-JIMENEZ has previously identified as his brother), and a third member of the Organization ("CC-2"). During that meeting, which was consensually recorded by CS-1, the participants discussed, among other things, an agreement to jointly conduct money laundering

operations in New York City, beginning in or about April 2016, as well as the commission rates for the movement of such money.

          c.      On or about April 19, 2015, CS-1 met in Las Vegas, Nevada, with ALEJANDRO JAVIER RODRIGUEZ-JIMENEZ and SERGIO URBINA, the defendant, at the residence of URBINA. During that meeting, the participants discussed, among other things, instructions regarding the arrangements for conducting a particular delivery of approximately $100,000 that was to take place in Atlanta, Georgia.

          d.      On or about April 21, 2015, CS-1 received a phone call from ALEJANDRO JAVIER RODRIGUEZ-JIMENEZ. During that call, ALEJANDRO JAVIER RODRIGUEZ-JIMENEZ informed CS-1 that CC-2 would be contacting CS-1 by phone to make arrangements to deliver the $100,000 to CS-1 in Atlanta. Over the next two days, CS-1 remained in contact with ALEJANDRO JAVIER RODRIGUEZ-JIMENEZ and CC-2 regarding the details of the planned delivery of narcotics proceeds.

          e.      On or about April 23, 2015, CS-1 received a text from a particular telephone assigned to CC-2 (the "CC-2 Phone"). During that text message conversation, the user of the CC-2 Phone made arrangements to meet with CS-1 for the purpose of negotiating the details of the delivery of narcotics proceeds. In particular, CS-1 agreed to meet with the user of the CC-2 Phone at a hotel on Peachtree Street in downtown Atlanta ("Hotel-1") to discuss the delivery further.

          f.      Shortly thereafter, and consistent with the conversation via the CC-2 Phone described above, CC-2, an individual now identified as a member of the Organization, arrived at Hotel-1 and met with CS-1. During that meeting, CC-2 confirmed, in substance and in part, that he would be delivering $100,000 in narcotics proceeds to CS-1 the next day to launder on behalf of the Organization. CC-2 further explained to CS-1 that another member of the Organization had originally been selected to make that delivery, but had backed out of the delivery because that member "got spooked" by the prospect that CS-1 might be a "cop."

          g.      The next day, April 24, 2015, and consistent with the conversation described above, CS-1 and CC-2 communicated via text message to make arrangements to meet. Pursuant to those communications, at approximately 9:10 am, CS-1 met CC-2 at Hotel-1. At that time, CC-2 handed CS-1 a backpack containing approximately $100,000 - *i.e.*, the narcotics proceeds

previously discussed and that CS-1 was to launder on behalf of the Organization.

      h.    On or about April 30, 2015, CS-1 communicated to CC-2 and ALEJANDRO JAVIER RODRIGUEZ-JIMENEZ that the $100,000 had been transferred to accounts in Mexico and on behalf of the Organization.[3]

      i.    Subsequent to this meeting, CS-1 introduced an undercover officer ("UC-1") to CC-2, ALEJANDRO JAVIER RODRIGUEZ-JIMENEZ, and JESUS RODRIGUGEZ-JIMENEZ, for the purpose of establishing UC-1 as a money laundering contact for the Organization.

    19.    Since their introduction in mid-2015, CC-2 has communicated with CS-1 and UC-1 via a particular email account (the "CC-2 Account") in connection with planning and executing funds transfers on behalf of the Organization. From my review of emails sent from the CC-2 Account to CS-1 and UC-1, and from my debriefing of CS-1 and UC-1, I have learned, among other things, that:

      a.    On or about June 2, 2015, CC-2 provided approximately $97,500 to CS-1 for the purpose of laundering those proceeds through accounts purportedly controlled by CS-1. Following that delivery, CC-2 provided CS-1 with the CC-2 Account as an email account to which CS-1 should provide a copy of written wire transfer instructions indicating that CS-1 had, in fact, directed CC-2's narcotics proceeds as planned. CS-1 did, thereafter, send a copy of a wire receipt to the CC-2 Account.

      b.    The following morning, on or about June, 3, 2015, at approximately 9:35 a.m., CS-1 received an email from the CC-2 Account stating, in substance and in part, that the receipt sent by CS-1 was not acceptable: "That is just a fax. Tha[t] is not what we need. I would need that document so I can track it. I can't see you again until you get the proper documentation. Or the package gets there. I would [sic] t[e]xt you early tomorrow." Subsequently, CS-1 and CC-2 confirmed with each other that proceeds wired by CS-1 had, in fact, been

---

[3] CS-1, acting under the supervision and direction of the DEA, did, in fact, effect a wire transfer payment to a particular bank account, the information for such transfer having been previously provided by ALEJANDRO JAVIER RODRIGUEZ-JIMENEZ, the defendant.

12

received in an account specified by CC-2, and that CS-1 and CC-2 could continue their dealings.

    c.  On or about June 3, 2015, CS-1 received a text message from CC-2, which read, in part, "We are good . . . let me know what time is good for you." Thereafter, and on the same day, CS-1 arranged to, and did, receive deliveries of $55,785, $197,820, and $71,180 from CC-2 on three separate occasions throughout the day.

    d.  On or about July 10, 2015, CC-2 arranged with UC-1 for the delivery of approximately $200,000 to a representative of UC-1 in Atlanta, Georgia. On the same day, an undercover officer ("UC-2") assuming the role of a representative of UC-1, met in Atlanta, Georgia, with SERGIO URBINA, the defendant, who, at that time, provided UC-2 with a duffle bag filled with approximately $199,735 in cash.

    e.  On or about July 22, 2015, at approximately 11:30 a.m., CC-2 met with UC-1 in Manhattan, New York. From listening to simultaneous audio transmissions of that meeting, and from my discussions with UC-1 following that meeting, I have learned, among other things that UC-1 and CC-2 discussed, among other things, future money pick-ups in Atlanta, Georgia, as well as in China, and that CC-2 requested that UC-1 meet CC-2 at a second location later on July 22, 2015.

    f.  On or about July 22, 2015, at approximately 1:48 p.m., UC-1 met for a second time with CC-2 at a prearranged meeting location in Manhattan. CC-2 was at that time in possession of a rolling bag, which CC-2 provided to UC-1, and which contained approximately $171,000 in cash.

    20.  In the course of this investigation, I responded, on or about September 3, 2015, to a report by Customs and Border Protection ("CBP") that JESUS RODRIGUEZ-JIMENEZ, the defendant, would be subjected to a luggage screening by CBP officers upon JESUS RODRIGUEZ-JIMENEZ's arrival in the United States at the McCarran International Airport in Las Vegas, Nevada. Upon arriving at McCarran International Airport, I reviewed photocopies of a notebook (the "Notebook") found among JESUS RODRIGUEZ-JIMENEZ's luggage during that screening. The Notebook contained, among other things, detailed, handwritten notes regarding what appears, based on the content of those notes, to be the March 27, 2015, meeting between JESUS RODRIGUEZ-JIMENEZ, ALEJANDRO JAVIER RODRIGUEZ-JIMENEZ, the defendant, CC-2, and CS-1, as described above. In particular, the Notebook reflects

conversations regarding amounts of funds to be laundered, the payment of a commission by the Organization to CS-1, cities in which money pick-ups were to occur, and a notation regarding the possibility of moving "300 up to 2,000,000 weekly" (*i.e.*, laundering between $300,000 and $2,000,000 on a weekly basis). Finally, the Notebook contains a handwritten organizational chart labeled, as translated from the original Spanish, "Corporate Organization," including JESUS RODRIGUEZ-JIMENEZ's name at the pinnacle of that organization.

21.     Continuing from in or about September 2015, up to and including in or about June 2016, UC-1 has continued to arrange money laundering operations at the direction of ALEJANDRO JAVIER RODRIGUEZ-JIMENEZ and JESUS RODRIGUEZ-JIMENEZ, the defendants, including arrangements for the transfer of over $1,900,000. Further, on or about March 4, 2016, UC-1, ALEJANDRO JAVIER RODRIGUEZ-JIMENEZ and JESUS RODRIGUEZ-JIMENEZ, along with another undercover officer, met to discuss their ongoing money laundering operations. Specifically, during that meeting, JESUS RODRIGUEZ-JIMENEZ stated, in substance and in part, that the Organization was prepared to receive bulk currency deliveries in the Los Angeles area. JESUS RODRIGUEZ-JIMENEZ further discussed a prior seizure of currency by law enforcement in Philadelphia, Pennsylvania, which had previously been arranged through CC-2. JESUS RODRIGUEZ-JIMENEZ further stated, in substance and in part, that JESUS RODRIGUEZ-JIMENEZ was in possession of vehicles with hidden compartments for use in transferring funds, as well as locations to be used to accumulate cash prior to its delivery to money couriers. During the same meeting, ALEJANDRO JAVIER RODRIGUEZ-JIMENEZ explained that he would communicate with UC-1 going forward using encrypted communication applications and "draft" emails in an email account (the "Covert Account") to be created and shared by UC-1 and ALEJANDRO JAVIER RODRIGUEZ-JIMENEZ.

22.     From my review of communications exchanged between ALEJANDRO JAVIER RODRIGUEZ-JIMENEZ, the defendant, and UC-1 over the Covert Account, I have learned, among other things that, ALEJANDRO JAVIER RODRIGUEZ-JIMENEZ has provided UC-1 with multiple bank accounts into which UC-1 was authorized by the Organization to wire laundered funds. Those accounts included an account held in the name of the Vegas Company and several accounts held in the name of "DMX TEC," (the "Mexico Company") *i.e.*, a company controlled by ALEJANDRO JAVIER RODRIGUEZ-JIMENEZ (who uses an email account with a domain name containing the name of DMX TEC).

B.  <u>Eloy Cardenas-Moreno</u>

    23.    Among the cities in which narcotics proceeds deliveries from the Organization have been made to UC-1, at the direction of ALEJANDRO JAVIER RODRIGUEZ-JIMINEZ, the defendant, is Philadelphia, Pennsylvania.  Based on debriefings of UC-1 and my review of reports of debriefings of a confidential source working with DEA agents based in Philadelphia ("CS-2"), and based on my discussions with DEA agents assigned to supervise the activities of CS-2, I have learned, among other things, that:

    a.    In or about April 2016, ALEJANDRO JAVIER RODRIGUEZ-JIMINEZ discussed with UC-1 a plan to obtain "stash" houses in, among other locations, Philadelphia, Pennsylvania, in which narcotics proceeds could be deposited by couriers, collected and counted by members of the Organization, and subsequently laundered by UC-1, ostensibly on behalf of the Organization.  This discussion was conducted, in part, via text messages exchanged between ALEJANDRO JAVIER RODRIGUEZ-JIMINEZ and UC-1, including the following exchange:

> AJR-J:    I am working in the places in Queen City [*i.e.*, Charlotte, North Carolina], Liberty [*i.e.*, Philadelphia], & LA but I don't fin[d] the right real [e]state office 4 this job, do u know somebody [who] can help me?
>
> UC-1    I can help in Liberty & LA, but I need 2 check in Queen City 2 abt staffing.
>
> AJR-J:    Liberty and LA is perfect for now . . . we whole [*i.e.* "hold"] like under a US company name not personal if possible.  We have the mngr 4 Liberty ready and work also.

From my training and experience, and my experience in this investigation, I believe that during this conversation, ALEJANDRO JAVIER RODRIGUEZ-JIMENEZ requested UC-1's assistance in setting up a "stash" house in Philadelphia (referred to between the two as "Liberty"), and that ALEJANDRO JAVIER RODRIGUEZ-JIMENEZ informed UC-1 that the Organization had a manager for that "stash" house prepared to oversee money collections at that location, as well as a ready supply of currency to collect in Philadelphia.

15

    b.  On or about May 2, 2016, ALEJANDRO JAVIER RODRIGUEZ-JIMINEZ informed UC-1, in substance and in part, that a member of the Organization, referred to by ALEJANDRO JAVIER RODRIGUEZ-JIMINEZ as "Eloy," and later identified as ELOY CARDENAS-MORENO, the defendant, a member of the Organization with responsibility for establishing "stash" houses around the United States, would meet with a representative of UC-1 (*i.e.*, CS-2) for the purpose of locating a suitable "stash" house in Philadelphia.

    c.  On or about May 6, 2016, CS-2 and ELOY CARDENAS-MORENO met in Philadelphia for the purpose of viewing a residence to be used as a "stash" house for the Organization. During their meeting, CS-2 asked whether the "stash" house would be used for the storage of narcotics, cash, or both, to which ELOY CARDENAS-MORENO replied, in substance and in part, that the house would be used only to store cash.

    d.  Subsequent to the Organization's establishment of the Philadelphia "stash" house, couriers delivered approximately $800,000 to the "stash" house on behalf of the Organization. On or about June 24, 2016, DEA agents, acting pursuant to a judicially authorized search and seizure warrant, seized approximately $500,000 from the "stash" house. On the same day, ALEJANDRO JAVIER RODRIGUEZ-JIMENEZ contacted UC-1 and stated, in substance and in part, that ALEJANDRO JAVIER RODRIGUEZ-JIMENEZ believed that UC-1 or someone working for UC-1 was acting as a law enforcement informant. At that time ALEJANDRO JAVIER RODRIGUEZ-JIMENEZ demanded that UC-1 meet with ALEJANDRO JAVIER RODRIGUEZ-JIMENEZ and JESUS RODRIGUEZ-JIMENEZ in New York City, stating, in part, "the uglies [*i.e.*, law enforcement officers] go into the place and takes [sic] all . . . . They crash the door . . . . 4 us is clear, your g[u]y is a rat."

C. <u>Money Deliveries and Narcotics Seizures Relating to the Organization</u>

  24. From my review of text messages exchanged between ALEJANDRO JAVIER RODRIGUEZ-JIMENEZ, the defendant, and UC-1, my debriefings of UC-1, and my review of reports prepared by, and discussions with, DEA agents working in Philadelphia and Atlanta, I have learned, among other things, that:

    a.  Between on or about January 29, 2016, and on or about February 3, 2016, ALEJANDRO JAVIER RODRIGUEZ-JIMENEZ, the defendant, arranged via text messages to and from UC-1 for

16

the delivery of approximately $100,000 to a representative of UC-1, which was to take place in Atlanta, Georgia.

    b.  On or about February 3, 2016, UC-2, who had previously received cash from SERGIO URBINA, the defendant, as described above, and assuming the role of a representative of UC-1, met in Atlanta, Georgia, with an individual who, at that time, provided UC-2 with a duffle bag filled with approximately $99,990 in cash.

    c.  Between on or about February 15, 2016, and on or about February 17, 2016, ALEJANDRO JAVIER RODRIGUEZ-JIMENEZ, the defendant, arranged via text messages to and from UC-1 for the delivery of approximately $300,000 to a representative of UC-1, which was to take place in Philadelphia, Pennsylvania.

    d.  On or about February 17, 2016, an undercover officer ("UC-3") assuming the role of a representative of UC-1, met in Philadelphia, with an individual ("CC-3") acting on behalf of ALEJANDRO JAVIER RODRIGUEZ-JIMENEZ. On that day, ALEJANDRO JAVIER RODRIGUEZ-JIMENEZ informed UC-1, in substance and in part, that CC-3 had been made uncomfortable by UC-3 and did not "trust" UC-3. Eventually on February 18, 2016, CC-3 did meet with UC-3 in the rear parking lot of a hotel located in Philadelphia, at which time CC-3 placed a cardboard box into the trunk of the vehicle driven by UC-3. That cardboard box was later determined to contain approximately $268,105.

    e.  On or about June 13, 2016, ALEJANDRO JAVIER RODRIGUEZ-JIMENEZ arranged via text messages to and from UC-1 for the delivery of approximately $400,000 to UC-1, which was to take place in the vicinity of Atlanta, Georgia. On or about June 14, 2016, an individual later identified as LEOBARDO TAMEZ, the defendant, delivered approximately $399,855 to UC-1 in Atlanta, Georgia. Following that delivery, on or about June 21, 2016, DEA agents based in Atlanta conducted a search, on consent, of the residence of TAMEZ in the vicinity of Atlanta. During that search, DEA agents seized approximately $719,484 found in two pieces of luggage, and a money counting device of the kind used in the Philadelphia "stash" house set up through the efforts of ELOY CARDENAS-MORENO, the defendant. During the course of the search of TAMEZ's residence, TAMEZ claimed that the cash found in that residence was the proceeds of a legitimate business run by his "boss," a man identified on TAMEZ's cellular telephone contact list, which was provided on consent, by the name "El Rey Cardenas."

WHEREFORE, I respectfully request that a warrant be issued for ALEJANDRO JAVIER RODRIGUEZ-JIMENEZ, a/k/a "alejandro@dmxtec.com," a/k/a "alejandro@vegasls.com," JESUS RODRIGUEZ-JIMENEZ, and ELOY CARDENAS-MORENO, SERGIO URBINA, and LEOBARDO TAMEZ, the defendants, and that they be arrested, and imprisoned or bailed, as the case may be.

_____
DAVID BEHAR
Special Agent
Drug Enforcement Administration

Sworn to before me this
28th day of June, 2016

_____
HON. JAMES L. COTT
United States Magistrate Judge
Southern District of New York

18